E-FILED
Thursday, 02 February, 2023  12:18:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RACHAEL MORRISSEY, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| KNOX COLLEGE, | ) ) ) | |
| Defendant. | ) | |

## FIRST AMENDED[1] CLASS ACTION COMPLAINT

Plaintiff Rachael Morrissey ("Plaintiff"), through her undersigned counsel, brings this action against Knox College. ("Knox" or "Defendant") pursuant to the investigation of her attorneys, personal knowledge as to herself and her own acts and otherwise upon information and belief, and alleges as follows:

### INTRODUCTION

1.      Knox College is a private, not-for-profit four-year college located in Galesburg, Illinois.

2.      On or about January 4, 2023, Knox announced publicly that on November 24, 2022, it had been the recipient of a hack and exfiltration of sensitive personal information ("SPI") involving many of its alumni (the "Data Breach").  Knox has notified the Maine Attorney General that 63,100 people have been affected.[2]

---

[1] Plaintiff amends her Complaint pursuant to This Court's Order of February 2, 2023.

[2] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/7b58c10e-a23e-489f-bbbe-c69a2fbe5977.shtml, last accessed January 30, 2023.

3.     Knox reported that this SPI included names, addresses, dates of birth, Social Security numbers, driver's license numbers, and passport numbers.[3]

4.     However, a ransomware group taking credit for the Data Breach claims it also accessed and exfiltrated additional information including "medical records, psychological assessments, and many other sensitive data [sic]."

5.     Plaintiff and Class members now face a present and imminent lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

6.     The information stolen in cyber-attacks allows the modern thief to assume victims' identities when carrying out criminal acts such as:

- Filing fraudulent tax returns;
- Using your credit history;
- Making financial transactions on behalf of victims, including opening credit accounts in victims' names;
- Impersonating victims via mail and/or email;
- Impersonating victims in cyber forums and social networks;
- Stealing benefits that belong to victims; and
- Committing illegal acts which, in turn, incriminate victims.

7.     Plaintiff's and Class members' SPI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the SPI of Plaintiff and Class members.

8.     As of this writing, there exist many class members who have no idea their SPI has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm.  The risk will remain for their respective lifetimes.

9.     Plaintiff brings this action on behalf of all persons whose SPI was compromised as

---

[3] *Id.*

a result of Defendant's failure to: (i) adequately protect consumers' SPI, (ii) adequately warn its current and former customers and potential customers of its inadequate information security practices, and (iii) effectively monitor its platforms for security vulnerabilities and incidents (the "Class"). Defendant's conduct amounts to negligence and violates federal and state statutes.

10.     Plaintiff and similarly situated individuals have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished inherent value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) deprivation of rights they possess under Illinois and Maryland data privacy laws; and (v) the continued and certainly an increased risk to their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located within this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

14.     Plaintiff Rachael Morrissey is a natural person domiciled in Baltimore, Maryland. Plaintiff Morrissey was attended Knox College from September 2012 to January 2017, during which time she was a resident of Knox County, Illinois.  While a student at Knox College, Defendant collected her SPI.  On or about January 10, 2023, Plaintiff Morrissey was informed via letter dated January 3, 2023 that she had been a victim of the Data Breach.

15.     Defendant Knox College is a not-for-profit Illinois corporation with its principal place of business at 2 E South Street, Galesburg, Illinois.

## FACTUAL ALLEGATIONS

16.     Defendant is a not-for-profit four-year liberal arts college founded in 1837.

17.     In the ordinary course of doing business with Defendant, students and prospective students are required to provide Defendant with SPI such as:

  a.  Contact and account information, such as name, usernames, passwords, address, telephone number, email address, and household members;

  b.  Authentication and security information such as government identification, Social Security number, security codes, and signature;

  c.  Demographic information, such as age, gender, and date of birth; and

  d.  Payment information, such as credit card, debit card, and/or bank account number; and

18.     Defendant represents on its website: "Knox College is committed to protecting your privacy and recognizes the importance of privacy to individuals and businesses visiting this website."[4]

---

[4] https://www.knox.edu/privacy-policy, last accessed January 30, 2023.

19.     Several days before Knox publicly admitted the data breach, the alumni of Knox College, received via their alumni email accounts, the following email from an entity which identifies itself as the "Hive Ransomware Group":



## Cyber Attack & Data Breach - KNOX Collage

Hello Knox Collage Community,

This is Hive Ransomware Group. For who don't know us, we are one of the most notorious ransomware groups. We have compromised your collage networks, evaded all of the strict security controls in place, and finally encrypted all of your collages critical infrastructure and data. The outage your collage is facing and will continue to face months moving forwards, we will explain how.

Your collage management will not be able to restore any of its infrastructure because we managed to compromise all of the backup servers as well.





Before we executed our attack , we spent
several weeks mining your sensitive data.
The data we have includes your personal
information , medical records ,
psychological assessments , and many
other sensitive data

After executing our attack and encrypting
your networks, Knox Collage Management
hired so called "Security Experts" to
handle the situation , which in turn started
negotiations with us. We provided them
proof that we have exfiltrated tons of data
from the Collage networks. We provided
them proof that we and only we can
decrypt their files. However, they chose to
gamble with your personal information.

They had the chance to resolve the
situation , and preventing a massive leak of
your sensitive data, but instead they

   



They had the chance to resolve the situation , and preventing a massive leak of your sensitive data, but instead they decided to let inexperienced and foolish so called "experts" cause you a huge damage.

In less than 24 hours , your data will be leaked on our site. We will provide in a later email the link to access our leak site. Additionally all of your SSN and Medical records will be put for sale, for every hacker to gain access and use your data in whatever illegal activity they want.

Well done to Knox Management and the noob security experts helping them. They fucked you over. To us , this is a normal business day. For you , its a sad day where everyone will see your personal and private info.

   

20.     In response, rather than offering assistance, on December 8, 2022, Knox College emailed alumni to inform them that due to "a system disruption caused by ransomware here at Knox," the administration would be permanently disabling all alumni email accounts by December 10, 2022.

21.     Notably, Defendant made no effort to confirm or deny the email from the purported ransomware group, nor did it offer any assistance or answer questions from the alumni community about exactly what information had been accessed or infiltrated.

22.     Not until January 3, 2023 did Defendant send out its "Notice of Data Security Incident", which mentions only that "[t]he information may have included your name, address, date of birth, Social Security Number, driver's license number, and passport number."

23.     Defendant has not, to Plaintiff's knowledge, offered any additional guidance to alumni beyond the information contained in the initial email informing alumni their email addresses would be deactivated and the physical letter dated January 3, 2023.

24.     The student newspaper at Knox College has noted that the Data Breach also caused the Registrar and tuition payment portals to be taken down for weeks.[5]

25.     The student newspaper reported that the email from the hackers also went out to all students, not merely to alumni, and stated that some students were anxious and unhappy with Defendant's response.[6]

---

[5] https://www.theknoxstudent.org/news/k01nszfta5ng2hshfp3qk67sxmhnm4, last accessed February 1, 2023.
[6] *Id.*

26.     Plaintiff's and class members' SPI was in the hands of hackers for at least a month – and according to the putative hackers "several weeks" before that – before Defendant began notifying them of the Data Breach.

27.     Defendant has been vague on its response to the Data Breach merely stating that it "immediately took steps to secure our network" and "implemented additional security features to reduce the risk of a similar incident occurring in the future."

28.     As of this writing, Defendant has offered no concrete information on the steps it has taken or specific efforts made to reasonably ensure that such a breach cannot or will not occur again.

29.     Defendant offering minimal assistance to Plaintiff and class members in the form of twelve months of credit monitoring and identity protection services.

30.     This response is entirely inadequate to Plaintiff and class members who now potentially face several years of heightened risk from the theft of their SPI and who may have already incurred substantial out-of-pocket costs in responding to the Data Breach.

31.     Defendant had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class members, to keep their SPI confidential and to protect it from unauthorized access and disclosure.

32.     Plaintiff and Class members provided their SPI to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

33.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches in the cellular communications services industry preceding the date of the breach.

34. Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

35. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[7] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[8]

36. The SPI of Plaintiff and members of the Classes was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the SPI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

37. Defendant knew, or reasonably should have known, of the importance of safeguarding the SPI of Plaintiff and members of the Class, including Social Security numbers, driver license or state identification numbers, and/or dates of birth, and of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and members of the Class a result of a breach.

_____

[7] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf, last accessed January 30, 2023.

[8] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

-11-

38.     Plaintiff and members of the Class now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

39.     The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the SPI of Plaintiff and members of the Class.

40.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

41.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

42.     The FTC further recommends that companies not maintain SPI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

43.     The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

44.     Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer SPI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

45.     A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.

46.     Best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

47.     Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

48.     These foregoing frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

49.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

50.     The SPI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9]

51.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[10]

52.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

53.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited

---

[9] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs, last accessed January 30, 2023.

[10] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), https://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed January 30, 2023.

into the new Social Security number."[11]

54. Furthermore, as the SSA warns:

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[12]

55. Here, the unauthorized access left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential SPI to mimic the identity of the user. The personal data of Plaintiff and members of the Class stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiff and the Class. Stolen personal data of Plaintiff and members of the Classes represents essentially one-stop shopping for identity thieves.

56. The FTC has released its updated publication on protecting SPI for businesses, which includes instructions on protecting SPI, properly disposing of SPI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

57. General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional

---

[11] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015),http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft, last accessed January 30, 2023.

[12] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed January 30, 2023.

Requesters:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

58.    Companies recognize that SPI is a valuable asset. Indeed, SPI is a valuable commodity.  A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other SPI on a number of Internet websites. The stolen personal data of Plaintiff and members of the Class has a high value on both legitimate and black markets.

59.    Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

60.    As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns.  Defendant's former and current customers whose Social Security numbers have been compromised now face a real, present, imminent and substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

61.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change — Social Security number, driver license number or government-issued identification number,

---

[13] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29, last accessed January 30, 2023.

name, and date of birth.

62.      This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[14]

63.      This is even more true for minors, whose Social Security Numbers are particularly valuable.  As one site noted, "The organization added that there is extreme credit value in Social Security numbers that have never been used for financial purposes. It's relatively simple to add a false name, age or address to a Social Security number. After that happens, there is a window for thieves to open illicit credit cards or even sign up for government benefits."[15]

64.      Among other forms of fraud, identity thieves may obtain driver licenses, government benefits, medical services, and housing or even give false information to police.  An individual may not know that his or her driver license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

## CLASS ACTION ALLEGATIONS

65.      Plaintiff brings this nationwide class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes:

All natural persons residing in the United States whose SPI was compromised in the Data Breach announced by Defendants on or about January 3, 2023 (the "Nationwide

---

[14] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html, last accessed January 30, 2023.

[15] https://www.identityguard.com/news/kids-targeted-identity-theft (last accessed April 30, 2022)

Class").

66.     The Illinois Subclass is defined as follows:

All natural Illinois residents whose SPI was compromised in the Data Breach announced by Defendants on or about January 3, 2023 (the "Illinois Subclass").

67.     The Maryland Subclass is defined as follows:

All natural Maryland residents whose SPI was compromised in the Data Breach announced by Defendants on or about January 3, 2023 (the "Illinois Subclass").

68.     The Illinois Subclass and the Maryland Subclass, together with the Nationwide Class, are collectively referred to herein as the "Classes" or the "Class."

69.     Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

70.     Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

71.     **Numerosity**: The Classes are so numerous that joinder of all members is impracticable. Defendant has not indicated the number of affected individuals as of this writing, but according to Defendant's notice to the Maine Attorney General, the number is at least 63,100.

72.     **Commonality**: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual members of the Classes. These include:

a.      When Defendant actually learned of the Data Breach and whether its response was adequate;

b.      Whether Defendant owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;

c.      Whether Defendant breached that duty;

d.      Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the SPI of Plaintiff and members of the Classes;

e.      Whether Defendant acted negligently in connection with the monitoring and/or protection of SPI belonging to Plaintiff and members of the Classes;

-18-

f.      Whether Defendant knew or should have known that it did not employ reasonable measures to keep the SPI of Plaintiff and members of the Classes secure and to prevent loss or misuse of that SPI;

g.      Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.      Whether Defendant caused Plaintiff's and members of the Classes damage;

i.      Whether Defendant violated the law by failing to promptly notify Plaintiff and members of the Classes that their SPI had been compromised;

j.      Whether Plaintiff and the other members of the Classes are entitled to credit monitoring and other monetary relief;

k.      Whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act; and

l.      Whether Defendant violated the Maryland Consumer Protection Act.

73.     **Typicality**: Plaintiff's claims are typical of those of the other members of the Classes because all had their SPI compromised as a result of the Data Breach due to Defendant's misfeasance.

74.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff's counsel are competent and experienced in litigating privacy-related class actions.

75.     **Superiority and Manageability**:  Under rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Individual damages for any individual member of the Classes are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

76.     Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole and as the California Subclass as a whole.

77.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.      Whether Defendant owed a legal duty to Plaintiff and members of the Classes to exercise due care in collecting, storing, using, and safeguarding their SPI;

b.      Whether Defendant breached a legal duty to Plaintiff and the members of the Classes to exercise due care in collecting, storing, using, and safeguarding their SPI;

c.      Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.      Whether members of the Classes are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

**FIRST CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(By Plaintiff Individually and on Behalf of the Nationwide Class)**

78.     Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 75.

79.     When Plaintiff and Class Members provided their SPI to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant under which—and by mutual assent of the parties—Defendant agreed to take reasonable steps to protect their SPI.

80.     Defendant solicited and invited Plaintiff and Class Members to provide their SPI as part of Defendant's regular business practices and as essential to the services transactions entered into between Defendant on the one hand and Plaintiff and Class Members on the other.  This conduct thus created implied contracts between Plaintiff and Class Members on the one hand, and Defendant on the other hand.  Plaintiff and Class Members accepted Defendant's offers by providing their SPI to Defendant in connection with their purchases from Defendant.

81.     When entering into these implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws, regulations, and industry standards.

82.     Defendant's implied promise to safeguard Plaintiff's and Class Members' SPI is evidenced by a duty to protect and safeguard SPI that Defendant required Plaintiff and Class Members to provide as a condition of entering into consumer transactions with Defendant.

83.     Plaintiff and Class Members paid money to Defendant to purchase services from Defendant. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of funds received as a result of the purchases to obtain adequate data security.  Defendant failed to do so.

84.     Plaintiff and Class Members, on the one hand, and Defendant, on the other hand, mutually intended—as inferred from alumni's continued use of Defendant's services—that Defendant would adequately safeguard SPI.  Defendant failed to honor the parties' understanding of these contracts, causing injury to Plaintiff and Class Members.

85.     Plaintiff and Class Members value data security and would not have provided their SPI to Defendant in the absence of Defendant's implied promise to keep the SPI reasonably secure.

86.     Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

87.     Defendant breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures and permitting the Data Breach to occur.

88.     As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

89.     Plaintiff and Class Members are entitled to compensatory, consequential, and other damages suffered as a result of the Data Breach.

90.     Plaintiff and Class Members also are entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiff and Nationwide Class members.


**SECOND CLAIM FOR RELIEF**
**(Violation of the Illinois Consumer Fraud and Deceptive Business**
**Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*.)**
**(By Plaintiff Individually and on Behalf of the Illinois Subclass)**

91.     Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 75.

92.     At the time Plaintiff provided her SPI to Defendant, she was an Illinois resident.

93.     Plaintiff is a "consumer" as that term is defined in 815 ILCS 505/1(e).

94.     Defendant is engaged in "trade" or "commerce", including the provision of services, as those terms are defined under 815 ILCS 5051(f).

95.     Defendant engages in the sale of "merchandise" as defined in 815 ILCS 505/1(b), which as defined includes "services" and "intangibles."

96.     Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ICFA) in violation of the ICFA, including but not limited to the following:

a.  Failing to maintain sufficient security to keep Plaintiffs' and Class Members' SPI from being hacked and stolen; and

b.  Failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and Class Members' SPI and other personal information from further unauthorized disclosure, release, data breaches, and theft.

97.     In addition, Defendant's failure to disclose that its computer systems were not well-protected and that Plaintiff's and Illinois Subclass Members' SPI was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and Illinois Subclass Members; and (b) defeat Plaintiff's and Illinois Subclass Members' ordinary, foreseeable and reasonable expectations concerning the security of their SPI on Defendant's servers.

98.     Defendant intended that Plaintiff and Illinois Subclass Members rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with its offering of services and incorporating Plaintiff's and Illinois Subclass Members' SPI on its servers, in violation of the ICFA.

99.     Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of Plaintiff's and Illinois Subclass Members' SPI, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45) and similar state laws.

100.    Defendant's wrongful acts and practices occurred within the ordinary course of trade or commerce.

101.    Defendant's wrongful acts and practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to Plaintiff and Illinois Subclass Members and were repeated continuously before and after Defendant obtained SPI and other information from Plaintiff and Illinois Subclass Members. Plaintiff and Illinois Subclass Members were adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

102.    Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and Illinois Subclass Members of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45, *et. seq.*, which provides:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

103.    815 ILCS 530/20 provides that a violation of 815 ILCS 530/10 "constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act."

104.    As a result of Defendant's wrongful conduct, Plaintiff and Illinois Subclass Members were injured in that they never would have allowed their SPI – the value over which Plaintiff and Illinois Subclass Members no longer have control – to be provided to Defendant if they had been told or knew that Defendant failed to maintain sufficient security to keep such data from being hacked and taken by others.

105.    Defendant's unfair and/or deceptive conduct proximately caused Plaintiff's and Illinois Subclass Members' injuries because, had Defendant maintained customer SPI with adequate security, Plaintiff and Illinois Subclass Members would not have lost it.

106.    As a direct and proximate result of Defendant's conduct, Plaintiff and Illinois Subclass Members have suffered harm, including but not limited to loss of time and money

-24-

resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the purchases made from Defendant that Plaintiff and Illinois Subclass Members would have never made had they known of Defendant's careless approach to cybersecurity; lost control over the value of SPI; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen SPI, entitling them to damages in an amount to be proven at trial.

107.    Pursuant to 815 ILCS 505/10a(a), Plaintiff and Illinois Subclass Members seek actual and compensatory damages, injunctive relief, and court costs and reasonable attorneys' fees as a result of Defendant's violations of the ICFA.

### THIRD CLAIM FOR RELIEF
**(Violation of the Maryland Personal Information Protection Act,**
**Md. Code Ann. §§ 14-3501, *et seq.*)**
**(By Plaintiff Individually and on Behalf of the Maryland Subclass)**

108.    Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 75.

109.    Under the Maryland Personal Information Protection Act ("MPIPA"), Md. Code Ann., Com. Law, § 14-3503(a), "[t]o protect Personal Information from unauthorized access, use, modification, or disclosure, a business that owns or licenses Personal Information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of Personal Information owned or licensed and the nature and size of the business and its operations."

110.    Defendant is a business that owns or licenses computerized data that includes Personal Information as defined by Md. Code Ann., Com. Law, § 14-3501(b)(1).

111.    Plaintiff and the Maryland Subclass are "individuals" and "customers" as defined in Md. Code Ann., Com. Law, §§ 14-3502(a) and 14-3503.

112.     Plaintiff's and the Maryland Subclass' Personal Information includes "[h]ealth information" and "[p]ersonal information" as covered under Md. Code Ann., Com. Law, §§ 14-3501(d)-(e).

113.     Defendant did not maintain reasonable security procedures and practices appropriate to the nature of the Personal Information owned or licensed and the nature and size of its business and operations in violation of Md. Code Ann., Com. Law, § 14-3503.

114.     The Data Breach was a "breach of the security system" as defined by Md. Code Ann., Com. Law, § 14-3504(1).

115.     Under Md. Code Ann., Com. Law, § 14-3504(c)(1), "[a] business that owns or licenses computerized data that includes Personal Information of an individual residing in the State, when it discovers or is notified of a breach of the security system, shall conduct in good faith a reasonable and prompt investigation to determine the likelihood that Personal Information of the individual has been or will be misused as a result of the breach."

116.     Under Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2), "[i]f, after the investigation is concluded, the business determines that the breach of the security of the system creates a likelihood that personal information has been or will be misused, the owner or licensee of the computerized data shall notify the individual of the breach" and that notification "shall be given as soon as reasonably practical but not later than 45 days after the business discovers or is notified of the breach of a security system."

117.     Because Defendant discovered a security breach and had notice of the security breach, Defendant had an obligation to disclose the security data breach in a timely and accurate fashion as mandated by Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2).

118.    After discovering the Data Breach, Defendant waited more than 45 days before notifying Plaintiffs and the Maryland Subclass.  By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2).

119.    While the exact number of days Defendant waited to inform Plaintiff and the Maryland Subclass are not currently known to Plaintiff, the email from the putative hackers indicates that Defendant had knowledge of the breach well before November 19, 2022, the date 45 days before the Notice of Data Security Incident was sent out.

120.    As a direct and proximate result of Defendant's violations of Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2), Plaintiff and the Maryland Subclass have suffered and will continue to suffer damages.

121.    Pursuant to Md. Code Ann., Com. Law, § 14-3508, Defendant's violations of Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2) are unfair or deceptive trade practices within the meaning of the Maryland Consumer Protection Act (codified at Md. Code Ann., Com. Law, § 13-301 et seq.) ("CPA") and are subject to the enforcement and penalty provisions contained within the CPA.

122.    Plaintiff and the Maryland Subclass seek relief under Md. Code Ann., Com. Law, § 14-3508, including actual damages and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment, in the Alternative**
**(By Plaintiff Individually and on Behalf of the Nationwide Class)**

123.    Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 79.

124.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of storing their SPI with Defendant in such a way that saved expense and labor for Defendant.

125.     Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' SPI, as this was used by Defendant to facilitate its core functions.

126.     The benefits given by Plaintiff and Class Members to Defendant were to be used by Defendant, in part, to pay for or recoup the administrative costs of reasonable data privacy and security practices and procedures.

127.     As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial.

128.     Under principles of equity and good conscience, Defendant should not be permitted to retain a benefit belonging to Plaintiff and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members granted to Defendant or were otherwise mandated by federal, state, and local laws and industry standards.

129.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds or benefits it received as a result of the conduct alleged herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all Class Members, requests judgment against the Defendant and the following:

A.     For an Order certifying the Class as defined herein, and appointing Plaintiff and her counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and

the Class Members' SPI;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff and Class Members' personal identifying information;

    iv.    prohibiting Defendant from maintaining Plaintiff's and Class Members' personal identifying information on a cloud-based database (if, in fact, it does so);

    v.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    vi.    requiring Defendant to engage independent third-party security auditors and

internal personnel to run automated security monitoring;

vii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems

for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.   For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For pre- and postjudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

-31-

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: February 2, 2023                    Respectfully Submitted,

                                           By: /s/ *Carl V. Malmstrom*
                                           Carl V. Malmstrom
                                           **WOLF HALDENSTEIN ADLER**
                                             **FREEMAN & HERZ LLC**
                                           111 W. Jackson Blvd., Suite 1700
                                           Chicago, Illinois  60604
                                           Tel: (312) 984-0000
                                           Fax:  (212) 686-0114
                                           malmstrom@whafh.com

                                           *Attorney for Plaintiff and the Putative Class*